FILED

1  James Arnold: Mattatall
   1880 West Carson Street, #F-349
2  Torrance, California
   (310) 530-6306
3

2009 SEP 14 PM 4:23

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY_____

4

5

6              UNITED STATES DISTRICT COURT

7         FOR THE CENTRAL DISTRICT OF CALIFORNIA

8                    WESTERN DIVISION

9

10  UNITED STATES OF AMERICA          © 2009

11         Plaintiff                  C.A. No. CV03-07016 DDP (PJWx)

12  v.                                **Done by Affidavit**

13  JAMES A. MATTATALL                **Verified**

14         Defendant

15

16  **EMERGENCY PETITION FOR DISMISSAL OF THE CASE DUE TO COURT
    FRAUD, OR ALTERNATIVELY, REQUEST TO STAY THE PROCEEDINGS**
17  **UNTIL AN INDEPENDENT AND IMPARTIAL JUDGE CAN BE FOUND**

18  **To: Chief Judge Audrey B. Collins**

19      **A.    Introduction**

20      This Petition is being filed in affidavit form and under the pains and the penalties of

21  perjury.  Since it has become obvious that the District Court Judge in this case, can not

22  and will not follow any oath of office as required by the Constitution (which will be

23  discussed herein), and refuses to follow the Constitution of the United States and

24  Supreme Court precedent, then the remedy according to law is for the chief judge in this

25  case to find an independent judge brought from Washington, D.C. to oversee these

26  proceedings.  Therefore, the Defendant files this petition directly with the chief judge of

27  this district, requesting the appointment of an impartial judge that has not received

28

1  compensation from the Internal Revenue Service or influence from the Internal Revenue

2  Service in the past.

**B.  Legal Questions Presented**

1.  **Can a District Court Judge in a Major District of the United States, such as Los Angeles, have all or almost all IRS cases rotated to that judge?**

2.  **Can a District Court Judge in a Major District of the United States, such as Los Angeles, ignore the Constitution and Supreme Court Authority?**

3.  **Can a District Court Judge in a Major District of the United States, such as Los Angeles, receive compensation in some form from one of the parties in interest, in violation of 28 USC section 454 and 28 USC section 455?**

4.  **If evidence establishes that the District Court Judge has no oath of office on file with any known authority, can that judge preside over Article III proceedings?**

**C.  History of the Case**

Affidavit of James A. Mattatall as relating to the facts in this case:

"I began my career as a tax preparer in early 1970s working with my father who started his in 1967.  I benefitted from his knowledge on tax law and procedures.  I was even called as an expert witness on tax issues at federal court hearing a number of years earlier.  During the approximately 40 years of representing people, I discovered many discrepancies between IRC, Regulations,

1   misrepresentations on behalf of IRS agents, officers and others representing the

2   IRS.  I helped many clients resolve their issues with the IRS, their problems

3   went away and IRS stopped harassing them.  I felt that as a licensed Tax

4   Preparer I was helping the government enforce the tax laws in a fair and proper

5   way in line with the requirements of the law itself.  However, about 10 years ago,

6   as my client base grew, what worked before in presenting the requirements of

7   the law from the tax code, was no longer honored or complied with by the IRS

8   agents. I questioned relentlessly their behavior on many occasions and filed

9   many notices. I asked the agents if they had a different understanding of the law

10   as reflected in the IRC (Internal Revenue Code) and almost all the time they did

11   not, but just did not agree with what the law stated.  I found that all around the

12   state time the IRS agents stated  that it was just my interpretation of the code,

13   even though all I did was read the IRC exactly as written.  When I asked what

14   their interpretation was, so I could properly understand how my

15   "interpretation" was wrong, the IRS agents would not answer.  It became

16   evident to me that the IRS agents were not aware of the whole picture of the

17   IRC.  The IRS agents appeared to be only schooled on limited sections related to

18   the IRC. I found about 70% of the agents  did not know their authority for an

19   audit  is  IRC § 7602. I had to provide the answer for them. I found this true

20   even of a number of supervisors, branch managers and IRS attorneys.  I felt it

21   was my moral duty to assist the IRS in the proper application of the law so that

22   my clients would pay the proper amount of taxes, not pay more taxes than

23   allowed by law and to help the IRS agents understand and stay within the

24   operation parameters congress established for the IRS employees, believing the

25   IRS agents were only doing their job and wanted to follow the law.

26        Around 2002 I decided to  represent only private parties and no longer

27   represent tax payers.  I did not renew my Tax Preparer's License and chose only

28   private consulting. After surrendering my Tax Preparer license, I found that

1   IRS agents not only did not understand, due to their limited grasp of the IRC,

2   but would make references to me as a tax protester or similar references. I had

3   an IRS attorney ask me if I was going to represent my clients the way the "IRS"

4   wanted it done. He continued with saying that if I did not represent my clients

5   the way they wanted it, there would be "legal" consequences. As it turned out,

6   he was referencing the civil case that followed in 2003. They did not understand

7   that they have no jurisdiction against my right to making a living at what I'm

8   good at as long as I don't interfere with their lawful jurisdiction, which I have

9   tried to keep separate from. As any American, I felt it was my moral duty to

10  help my fellow Americans. I continued to ask the IRS agents for their

11  understanding of the laws and they continued to refuse to answer, but insisted

12  my reading of the law was wrong somehow without any legal references or law

13  to support their opinions. Prior to my dropping my Tax Preparer's License, I

14  had no problem with the IRS and I have numerous times resolved issues with the

15  client and the IRS to the complete satisfaction of the client and IRS. I am not a

16  tax protestor. I believe the government has the right and duty to collect the

17  proper amount of taxes through the proper application of the IRC and other

18  revenue laws as intended by Congress.

19      I did work with the government, but after I dropped my privileged status as

20  tax preparer, for some reason the government became increasing hostile

21  towards me. Even though I would look that the paperwork provided by my

22  clients to determine if they were private men or women before providing my

23  consulting services to them, the government wanted to control my actions in

24  dealing with the private sector men and women outside their jurisdiction. I was

25  no longer in their ranks and I began feeling retaliation from them. As I

26  continued to do research after the injunction ordered by the court, I discovered

27  more government fraud. The attorney assigned to me did not understand the

28  constitutional limitations on government or that I was in the wrong court. I

1  have not been able to find justice in 2004  and I cannot find it now in the courts.

2  I have asked for witness protection and I intend to testify in front of Congress

3  according to my expertise and 40 years experience in the field of Taxation. The

4  Law resonates with my moral duty to report a crime when I see it.  I have

5  nothing to hide.

6      Under the recent attack by the government, I have found that the judge in

7  this case, judge Dean Pregerson, does not have an oath of office unlike his father

8  Harry Pergerson who has an oath of office and has presidential appointment,

9  even though I have asked the government department who keeps the oath of

10  office for a copy of Dean Pregerson's oath of office and they could not find it."

11

12

13  **D.  Subsequent Evidence Discovered**

14

15  On September 10, 2009, Defendant went to the court to determine the elements of

16  bias by this judge in the cases he handles.  Defendant requested from the clerk's

17  office all records of all cases handled by this judge and all records showing any

18  acquittals of Defendants.  The clerk, knowingly, said such records did not exist.

19  Subsequently, Defendant had others pull those records from PACER, showing that

20  this judge had been the presiding judge in approximately 650 cases, and found 1

21  dismissal out of 650 cases, a ratio of 1/650.  The dismissal in that case only occurred

22  when the Defendant discovered and presented evidence that this judge has no oath of

23  office of record.  Discounting that case, this judge never rules in favor of the

24  Defendant.  Clear evidence establishes that this judge always rules in favor of the

25  government.

26

27  On September 11, 2009 Defendant contacted the Senate Judiciary Committee

28  personally, and verified that this judge has no valid oath of office of record with the

Judiciary Committee which would allow this person to act as a judge in this case.

A preliminary investigation of IRS related cases in this district shows that almost all cases go to this judge, despite the requirement of rotation established by the district to preserve the presence of impartiality.

**E.  Argument**

It has been established by the history of the case, and normal presumptions applied to those facts, that the District Court judge in this case has a financial interest in this case.  It has been established by the record of the case and normal presumptions that the judge in this case is acting as nothing more than a second prosecutor, cleaning up when the government commits error, and protecting them from the normal requirements of an impartial court.

**1.  The judge is currently in violation of the statutory provisions of 28 USC sec. 454:**

"Any justice or judge under the authority of the United States who engages in the practice of law is guilty of a high misdemeanor."  28 USC section 454.

In this case, the judge has denied every motion presented by Defendant, has granted every motion presented by Plaintiff, and has refused to make findings of fact and law as required by Due Process in this case.  The record in this case reflects that the judge has acted as a second prosecutor, granting any motion the government files, and denying any motion the Defendant files.  See judge's orders as referenced in the Docket.

1       When Defendant raised key questions in the case related to jurisdiction, which

2   require that all proceedings stop and that the government prove its jurisdiction, see *Rhode*

3   *Island v. Massachusetts*, 37 U.S. 657 (1838), 39 U.S. 210 (1840), the judge denied them

4   as "frivolous" (frivolous is a word only used when an argument is patently ridiculous, not

5   supported by case law or fact, and for a judge to label an argument frivolous requires

6   specific findings of fact and law to support the claim-none of the Defendant's arguments

7   qualify as frivolous, a word thrown around by this judge like "a", "and", or "the". See

8   judge's orders as referenced in the Docket.

9

10       For a judge to label a pro se litigant's arguments frivolous without making

11   specific findings of fact and law is the same as saying, "You submitted the argument, I

12   deem it frivolous, since I deem it frivolous, I am denying it, and I don't have to tell you

13   why because I am a judge".

14

15       Yet the record of the Congress of the United States is very clear. No quorum

16   existed in the House of Representatives on the only vote in the first session of the 80th

17   Congress on Public Law 80-772, Title 18 of the criminal code, on May 12, 1947, in

18   violation of the quorum provision of the Constitution of the United States. No vote

19   occurred in the House of Representatives in the second session of the 80th Congress on

20   Public Law 80-772, Title 18 of the criminal code in the second session of the 80th

21   Congress in 1948. Therefore, the House never passed the bill. The argument does not

22   require an engineering degree, nor does it require any other proof beyond the government

23   records. The court is presumed to know the law.

24

25       The law is also clear related to Title 26. See attached memorandum of law,

26   Appendix A.

27

28       The judge has no jurisdiction in this case to act when the statute denying that right

1  is clear.

2

3      Yet the judge continues to act, in direct violation of any statutory authority. When

4  the court's authority was challenged, the court was required to stop all proceedings and

5  require the government to prove its authority.  Once again, the court acted as a second

6  prosecutor, cleaning up for the government, practicing law from the bench.  See judge's

7  orders as referenced in the Docket..

8

9      **2.  The Judge is Currently in Violation of 28 USC Section 455**

10

11  **"(a)** Any justice, judge, or magistrate judge of the United States shall disqualify himself

12  in any proceeding in which his impartiality might reasonably be questioned.

13  **(b)** He shall also disqualify himself in the following circumstances:

14  **(1)** Where he has a personal bias or prejudice concerning a party, or personal knowledge

15  of disputed evidentiary facts concerning the proceeding;

16  **(2)** Where in private practice he served as lawyer in the matter in controversy, or a

17  lawyer with whom he previously practiced law served during such association as a

18  lawyer concerning the matter, or the judge or such lawyer has been a material witness

19  concerning it;

20  **(3)** Where he has served in governmental employment and in such capacity participated

21  as counsel, adviser or material witness concerning the proceeding or expressed an

22  opinion concerning the merits of the particular case in controversy;

23  **(4)** He knows that he, individually or as a fiduciary, or his spouse or minor child residing

24  in his household, has a financial interest in the subject matter in controversy or in a party

25  to the proceeding, or any other interest that could be substantially affected by the

26  outcome of the proceeding;

27  **(5)** He or his spouse, or a person within the third degree of relationship to either of them,

28  or the spouse of such a person:

1  (i) Is a party to the proceeding, or an officer, director, or trustee of a party;

2  (ii) Is acting as a lawyer in the proceeding;

3  (iii) Is known by the judge to have an interest that could be substantially affected by the

4  outcome of the proceeding;

5  (iv) Is to the judge's knowledge likely to be a material witness in the proceeding.

6  (c) A judge should inform himself about his personal and fiduciary financial interests,

7  and make a reasonable effort to inform himself about the personal financial interests of

8  his spouse and minor children residing in his household.

9  (d) For the purposes of this section the following words or phrases shall have the

10  meaning indicated:

11  (1) "proceeding" includes pretrial, trial, appellate review, or other stages of litigation;

12  (2) the degree of relationship is calculated according to the civil law system;

13  (3) "fiduciary" includes such relationships as executor, administrator, trustee, and

14  guardian;

15  (4) "financial interest" means ownership of a legal or equitable interest, however small,

16  or a relationship as director, adviser, or other active participant in the affairs of a party,

17  except that:

18  (i) Ownership in a mutual or common investment fund that holds securities is not a

19  "financial interest" in such securities unless the judge participates in the management of

20  the fund;

21  (ii) An office in an educational, religious, charitable, fraternal, or civic organization is not

22  a "financial interest" in securities held by the organization;

23  (iii) The proprietary interest of a policyholder in a mutual insurance company, of a

24  depositor in a mutual savings association, or a similar proprietary interest, is a "financial

25  interest" in the organization only if the outcome of the proceeding could substantially

26  affect the value of the interest;

27  (iv) Ownership of government securities is a "financial interest" in the issuer only if the

28  outcome of the proceeding could substantially affect the value of the securities.

1  (e) No justice, judge, or magistrate judge shall accept from the parties to the proceeding a

2  waiver of any ground for disqualification enumerated in subsection (b). Where the

3  ground for disqualification arises only under subsection (a), waiver may be accepted

4  provided it is preceded by a full disclosure on the record of the basis for disqualification.

5  **(f)** Notwithstanding the preceding provisions of this section, if any justice, judge,

6  magistrate judge, or bankruptcy judge to whom a matter has been assigned would be

7  disqualified, after substantial judicial time has been devoted to the matter, because of the

8  appearance or discovery, after the matter was assigned to him or her, that he or she

9  individually or as a fiduciary, or his or her spouse or minor child residing in his or her

10  household, has a financial interest in a party (other than an interest that could be

11  substantially affected by the outcome), disqualification is not required if the justice,

12  judge, magistrate judge, bankruptcy judge, spouse or minor child, as the case may be,

13  divests himself or herself of the interest that provides the grounds for the

14  disqualification." 28 USC section 455.

15

16      Twice, Defendant has requested for the judge to produce records related to any

17  financial interest in this case. See Docket. In each case the judge has refused. It is now

18  presumed by the court's actions that the judge has a financial interest in this case, which

19  disqualifies the judge pursuant to 28 USC section 455. Furthermore, the records on their

20  face establish the bias of the judge, and the direction of a verdict for the government, a

21  denial of Defendant's 5th and 6th Amendment rights.

22

23      **3. The Judge in This Case Has No Oath of Office and Can Not Sentence**

24

25      Defendant presented the evidence, that the judge in this case has no oath of office

26  on file and therefore has no Article III authority. The judge refused to produce evidence

27  contrary to that fact, and therefore, that fact is admitted. On September 11, 2009,

28  Defendant contacted the Senate Judiciary Committee and confirmed that this judge has

1  no oath of office on file. Without Article III authority, the judge is acting as an

2  "imposter", pretending to be a government official. Such a person has no authority to act

3  on behalf of the government and has no ability to sentence as would be required by

4  Article III of the Constitution.

5

6  **F. Conclusion**

7

8       The judge in this case is bypassing normal rotation procedures of a court and

9  receiving all or almost all cases related to the IRS, a prima facie case of bias and

10  prejudice. The court even lied to the Defendant when he asked for records establishing

11  the independence of the judge. The judge is also clearly acting without jurisdiction,

12  making him nothing more than a pretend judge. The judge is acting as nothing more than

13  a second prosecutor, practicing law from the bench, in violation of 28 USC section 454,

14  and the evidence now establishes that the judge has a financial interest in this case, in

15  violation of 28 USC section 455. Defendant requests that the chief judge of this district

16  immediately remove the judge in this case, and bring in an independent judge who will

17  certify before the court that he/she has never received any benefits or compensation,

18  directly or indirectly from the Internal Revenue Service.

19

20  **G. Prayer for Relief**

21

22  **Wherefore, premises considered, Defendant moves this Honorable Court to,**

23  **without delay:**

24

25

26      1. Remove the presiding judge from this case for violations of 28 USC sections

27      454 and 455;

28

2.  Bring a judge into the case who will certify before the court that he has received no financial or other benefits from the Internal Revenue Service;

3.  For such other and further relief as the court deems just and proper.

Respectfully submitted this 14th day of September, 2009.

James Arnold: Mattatall

## CERTIFICATION UNDER PENALTY OF PERJURY

I, James Arnold: Mattatall, certify on this the 14th day of September, 2009, pursuant to 28 USC § 1746 that the foregoing is true and correct.

James Arnold: Mattatall

## VERIFICATION

I certify the foregoing is true and correct under the penalty of perjury pursuant to 28 USC § 1746, that I am over the age of 18 years, that I have personal knowledge of the facts stated herein, and that I am fully competent to testify to those facts.

James Arnold: Mattatall

**CERTIFICATE OF SERVICE**

On this 14th day of September, 2009, a true and correct copy of this

Motion, **EMERGENCY PETITION FOR DISMISSAL OF THE CASE DUE**

**TO COURT FRAUD, OR ALTERNATIVELY, REQUEST TO STAY THE**

**PROCEEDINGS UNTIL AN INDEPENDENT AND IMPARTIAL JUDGE**

**CAN BE FOUND,** was sent to the opposing attorneys of record by first class

mail, postage prepaid or better.


James Arnold: Mattatall


GEORGE S. CARDONA          Certified Mail Number: <u>7009 0960 0001 1154 0986</u>
United States Attorney
SANDRA BROWN
Assistant United States Attorney
ROBERT CONTE
Assistant United States Attorney
Federal Building, Room 7211
300 North Los Angeles Street
Los Angeles California 90012

MICHAEL R. PAHL          Certified Mail Number: <u>7009 0960 0001 1154 0993</u>
Mn. Bar. No. 0234539
Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 7238
Ben Franklin Station
Washington, D.C. 20044

James Arnold: Mattatall
1880 West Carson Street, #F-349
Torrance, California
(310) 530-6306

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | © 2009 |
| Plaintiff | C.A. No. CV03-07016 DDP (PJWx) |
| v. | **Done by Affidavit** |
| JAMES A. MATTATALL | **Verified** |
| Defendant | |

## Memorandum of Law Supporting Challenge to Criminal Jurisdiction:

### Federal Judicial Authority within the Several States

This memorandum will be construed to comply with provisions necessary to establish presumed fact (Rules 301 and 302, Federal Rules of Evidence, and attending State rules), should interested parties fail to rebut any given allegation of fact, or matter of law, addressed herein. This position will be construed as adequate to meet all requirements of judicial notice, thus preserving fundamental Law. Matters addressed herein, if not rebutted, will be construed to have general application. This memorandum addresses jurisdiction of United States District Courts ("USDC") and related agencies of the United States (federal government).

### Part I: Foundation of Law, Jurisdiction, Principles & History

In the American system of Government, the Separation of Powers Doctrine works in two ways: First, it assures separation between the three branches of government, the branches being legislative, executive, and judicial. Second, the Doctrine effects vertical separation between the operations of the state and federal governments, or put another way, operations of the government of the United States and the governments of the several States which are parties to the Constitution for the United States of America, as lawfully amended (hereinafter "U.S. Constitution").

Appendix A - 1

In this system, as asserted by American Founders in the Declaration of Independence, all Men (and Women) are created equal, and are equally endowed by their Creator with certain unalienable or inherent Rights, those listed in the Declaration of Independence being the Rights to life, liberty, and the pursuit of happiness, or in the less poetic phrasing of the Fifth Amendment to the U.S. Constitution: life, liberty and property. This list, of course, is not exhaustive, as articulated in the Ninth and Tenth Amendments to the U.S. Constitution, and all, individually and collectively, are accountable in the framework of "the laws of Nature and Nature's God." The phrase, in modern terms, is better understood as physical and moral law.    Man cannot author or amend the laws of Nature and Nature's God, but is directly accountable in the framework of cause and effect, or where moral law is concerned, cause and consequence.

By establishing these principles prior to addressing the reasons for, and the power and operation of, government, American Founders preserved the essence of English and American-lineage Common Law which evolved and was proven by cultural experience over many hundreds of years.   The Magna Charta, drafted and signed by King John in 1215, is commonly recognized as the point of demarcation so far as a formal proclamation of common rights is concerned.   The foundation was basically biblical, with the understanding that People are individually created and are, therefore, individually accountable to God.   Even when governments encroach on the special relationship between Man and God, Man is still accountable, individually and collectively, and s/he invariably suffers the consequences of tyranny.

The Founders went on to say that governments are established among Men for the sole purpose of securing inherent Rights, and governments so established may rule only by the consent of the Governed.

In July 1776, the notion of specifically delegated authority conveyed by constitutions was well understood, because the English considered the Magna Charta and subsequent similar documents to be elements of their unwritten constitution. On the other hand, American colonies had continuing experience with written constitutions for civil government which began in 1636 (Massachusetts).

Lowell H. Becraft, Jr., an attorney from Huntsville, Alabama, addresses historical events leading to the American Revolution, in his privately distributed memorandum on federal jurisdiction, as follows:

> The original thirteen colonies of America were each separately established by
>
> charters from the English Crown.   Outside of the common bond of each being a
>
> dependency and colony of the mother country, England, the colonies were not
>
> otherwise united.   Each had its own governor, legislative assembly and courts, and
>
> each was governed separately and independently by the English Parliament.

The political connections of the separate colonies to the English Crown and Parliament descended an unhappy state of affairs as the direct result of Parliamentary acts adopted in the late 1760's and early 1770's.   Due to the real and perceived dangers caused by these various acts, the First Continental Congress was convened by representatives of the several colonies in October, 1774, the purpose of which was to submit a petition of grievances to the British Parliament and Crown.   By the Declaration and Resolves of the First Continental Congress, dated October 14, 1774, the colonial representatives labeled these Parliamentary acts of which they complained as "impolitic, unjust, and cruel, as well as unconstitutional, and most

1   dangerous and destructive of American rights," and the purpose of which were
    designs, schemes and plans "which demonstrate a system formed to enslave America."
2   Revolution was assuredly in the formative stages absent conciliation between the mother
    country and colonies.

3
        Between October, 1775, and the middle of 1776, each of the colonies separately
4
    severed their ties and relations with England, and several adopted constitutions for
5
    the newly formed States.  By July, 1776, the exercise of British authority in any
6
    and all colonies was not recognized in any degree.  The capstone of this actual
7
    separation of the colonies from England was the more formal Declaration of
8
    Independence.
9

10

11      The legal effect of the Declaration of Independence was to make each new State a

12  separate and independent sovereign over which there was no other government of

13  superior power or jurisdiction.   This was clearly shown in M'Ilvaine v. Coxe's

14  Lessee, 8 U.S. (4 Cranch) 209, 212 (1808), where it was held:

15  This opinion is predicated upon a principle which is believed to be undeniable,

16  that the several states which composed this Union, so far at least as regarded their

17  municipal regulations, became entitled, from the time when they declared themselves

18  independent, to all the rights and powers of sovereign states, and that they did not

19  derive them from concessions made by the British king. The treaty of peace contains

20  recognition of their independence, not a grant of it. From hence it results, that the

21  laws of the several state governments were the laws of sovereign states, and as

22  such were obligatory upon the people of such state, from the time they were

23  enacted.

24
        And a further expression of similar import is found in Harcourt v. Gaillard, 25 U.S.
25
    (12 Wheat.) 523, 526, and 527 (1827), where the Court stated:
26

27  There was no territory within the United States that was claimed in any other right

28  than that of some one of the confederated states; therefore, there could be no

1  acquisition of territory made by the United States distinct from, or independent

2  of some one of the states.

3  Each declared itself sovereign and independent, according to the limits of its territory.

4
5  [T]he soil and sovereignty within their acknowledged limits were as much theirs

   at the declaration of independence as at this hour.

6

7  Thus, unequivocally, in July, 1776, the new States possessed all sovereignty, power,

8  and jurisdiction over all the soil and persons in their respective territorial limits.

9
   This condition of supreme sovereignty of each State over all property and persons

10 within the borders thereof continued notwithstanding the adoption of the Articles of

11 Confederation. In Article II of that document, it was expressly stated:

12

13 Article II. Each state retains its sovereignty, freedom, and independence, and

14 every Power, Jurisdiction and right, which is not by this confederation expressly

15 delegated to the United States, in Congress assembled.

16
      As the history of the confederation government demonstrated, each State was
17 indeed sovereign and independent to the degree that it made the central government
   created by the confederation fairly ineffectual. These defects of the
18 confederation government strained the relations between and among the States and the
   remedy became the calling of a constitutional convention. The representatives which
19 assembled in Philadelphia in May, 1787, to attend the Constitutional Convention met for
   the primary purpose of improving the commercial relations among the States,
20 although the product of the Convention produced more than this. But, no intention was
   demonstrated for the States to surrender in any degree the jurisdiction so possessed by
21 the States at that time, and indeed the Constitution as finally drafted continued the same
   territorial jurisdiction of the States as existed under the Articles of Confederation. The
22 essence of this retention of state jurisdiction was embodied in Art. I, 8, Cl. 17 of the U.S.
   Constitution, which reads as follows:

23
   To exercise exclusive Legislation in all Cases whatsoever, over such District (not
24 exceeding ten Miles square) as may, by Cession of particular States, and the

25 Acceptance of Congress, become the Seat of the Government of the United States,

26 and to exercise like Authority over all Places purchased by the Consent of the

27 Legislature of the State in which the Same shall be, for the Erection of Forts,

28 Magazines, Arsenals, dock-Yards, and other needful Buildings; ....

Appendix A - 4

The necessity for granting federal government sovereignty over land which would serve as the seat of that government became conspicuous during the Revolution, when a contingent of irate folks from the Continental Army beleaguered Congress while it was in session in Philadelphia.    Members of Congress  fled Philadelphia to  Princeton, New Jersey, and from there to Annapolis, Maryland.    Philadelphia and Pennsylvania governments were unable, or unwilling, to disperse the rebels who taunted and insulted Members of Congress.   Problems persisted for the weak government under the Articles of Confederation following the Revolution, and it was in this framework that the Constitutional Convention was called in 1787.   The purpose for establishing a seat of government under  Congress' exclusive  legislative jurisdiction was addressed in Essay No. 43 of The Federalist:

The indispensable necessity of complete authority at the seat of government carries its own evidence with it.  It is a power exercised by every legislature of the Union, I might say of the world, by virtue of its general supremacy.  Without it not only the public authority might be insulted and its proceedings interrupted with impunity, but a dependence of the members of the general government on the State comprehending the seat of the government for protection in the exercise of their duty might bring on the national councils an imputation of awe or influence equally dishonorable to the government and dissatisfactory to the other members of the Confederacy. This consideration has the more weight as the gradual accumulation of public improvements at the stationary residence of the government would be both too great a public pledge to be left in the hands of a single State, and would create so many obstacles to a removal of the government, as still further to abridge its necessary independence.   The extent of this federal district is sufficiently circumscribed to satisfy every jealousy of an opposite nature.   And as it is to be appropriated to this use with the consent of the State ceding it; as the State will no doubt provide in the compact for the rights and the consent of the citizens inhabiting it; as the inhabitants will find sufficient inducements of interest to become willing parties to the cession; as they will have had their voice in the election of the government which is to exercise authority over them; as a municipal legislature for local purposes, derived from their own suffrages, will of course be allowed them; and as the authority of the legislature of the State, and of the

1    inhabitants of the ceded part of it, to concur in the cession will be derived from

2    the whole people of the State in their adoption of the Constitution, every

3    imaginable objection seems to be obviated.

4    The necessity  of a  like authority  over forts, magazines, etc., established by the

5    general government, is not less evident.  The public money expended on such places,

6    and the public property deposited in them, require that they should be exempt from

7    the authority of the particular State.   Nor would  it be  proper for the places on

8    which the  security of the entire Union  may depend to  be in  any degree  dependent

9    on a particular member of it. All objections and scruples are here also obviated by

10   requiring the concurrence of the States concerned in every such establishment.

11

12   Becraft cites several early court cases which addressed the matter of State versus
     "United States" (federal government) jurisdiction, with each of the decisions
13   reinforcing the principle of State sovereignty, unless or until land is ceded by a State
     legislature to the United States:

14   Perhaps one of the earliest decisions on this point was United States v. Bevans, 16

15   U.S. (3 Wheat.) 336 (1818), which involved a federal prosecution for a murder

16   committed on board the Warship, Independence, anchored in the harbor of Boston,

17   Massachusetts.   The defense complained that only the state had jurisdiction to

18   prosecute and argued that the federal Circuit Courts had no jurisdiction of this crime

19   supposedly committed within the federal government's admiralty jurisdiction.   In

20   argument before the Supreme Court, counsel for the United States admitted as

21   follows:

22

23   The exclusive jurisdiction which the United States have in forts and dock-yards

24   ceded to them, is derived from the express assent of the states by whom the

25   cessions are made. It could be derived in no other manner; because without it, the

26   authority of the state would be supreme and exclusive therein, 3 Wheat. at 350, 351.

27

28   In holding  that the  State of Massachusetts had jurisdiction over the crime, the

Court held:

What, then, is the extent of jurisdiction which a state possesses?

We answer, without hesitation; the jurisdiction of a state is co-extensive with its territory; co-extensive with its legislative power, 3 Wheat. at 386, 387.

The article which describes the judicial power of the United States is not intended for the cession of territory or of general jurisdiction.

> ... Congress has power to exercise exclusive jurisdiction over this district, and over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dock-yards, and other needful buildings.

It is observable that the power of exclusive legislation (which is jurisdiction) is united with cession of territory, which is to be the free act of the states. It is difficult to compare the two sections together, without feeling a conviction, not to be strengthened by any commentary on them, that, in describing the judicial power, the framers of our constitution had not in view any cession of territory; or, which is essentially the same, of general jurisdiction, 3 Wheat., at 388.

Thus in Bevans, the Court established a principle that federal jurisdiction extends only over the areas wherein it possesses the power of exclusive legislation, and this is a principle incorporated into all subsequent decisions regarding the extent of federal jurisdiction. To hold otherwise would destroy the purpose, intent and meaning of the entire U.S. Constitution.

The decision in Bevans was closely followed by decisions made in two state courts and one federal court within the next two years. In Commonwealth v. Young, Brightly, N.P. 302, 309 (Pa. 1818), the Supreme Court of Pennsylvania was presented with the issue of whether lands owned by the United States for which Pennsylvania had never ceded jurisdiction had to be sold pursuant to state law. In deciding that the state law of Pennsylvania exclusively controlled this sale of federal land, the Court held:

The legislation and authority of congress is confined to cessions by particular states for the seat of government, and purchases made by consent of the legislature of the state, for the purpose of erecting forts.    The legislative power and exclusive jurisdiction remained in the several states, of all territory within their limits, not ceded to, or purchased by, congress, with the assent of the state legislature, to prevent the collision of legislation and authority between the United States and the several states.

A year later, the Supreme Court of New York was presented with the issue of whether the State of New York had jurisdiction over a murder committed at Fort Niagara, a federal fort. In People v. Godfrey, 17 Johns. 225, 233 (N.Y. 1819), that court held that the fort was subject to the jurisdiction of the State since the lands therefore had not been ceded to the United States. The rationale of its opinion stated:

> To oust this state of its jurisdiction to support and maintain its laws, and to punish crimes, it must be shown that an offense committed within the acknowledged limits of the state, is clearly and exclusively cognizable by the laws and courts of the United States. In the case already cited, Chief Justice Marshall observed, that to bring the offense within the jurisdiction of the courts of the union, it must have been committed out of the jurisdiction of any state; it is not (he says,) the offense committed, but the place in which it is committed, which must be out of the jurisdiction of the state.

The case relied upon by this court was U.S. v. Bevans supra.

At about the same time that the New York Supreme Court rendered its opinion in Godfrey, a similar fact situation was before a federal court, the only difference being that the murder committed in the case occurred on land which had been ceded to the United States. In United States v. Cornell, 25 Fed.Cas. 646, 648 No. 14,867 (C.C.D.R.I., 1819), the court held that the case fell within federal jurisdiction, describing such jurisdiction as follows:

> But although the United States may well purchase and hold lands for public

Appendix A - 8

purposes, within the territorial limits of a state, this does not of itself oust the jurisdiction or sovereignty of such State over the lands so purchased. It remains until the State has relinquished its authority over the land either expressly or by necessary implication.

When therefore a purchase of land for any of these purposes is made by the national government, and the State Legislature has given its consent to the purchase, the land so purchased by the very terms of the constitution ipso facto falls within the exclusive legislation of Congress, and the State jurisdiction is completely ousted.

Through the first half of the 19th century, State and United States territorial jurisdiction was reasonably clear-cut, as accounts above evidence. But, during the Civil War and afterwards, entrenched powers concluded that Congress, on behalf of the United States, has a unique role in and through the territorial United States in those lands, whether ceded by legislatures of the several States, or acquired, by war or otherwise, by the United States. This alleged authority is at Article IV, Section 3, Clause 2 (4:3:2) of the U.S. Constitution:

The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory and other Property belonging to the United States ....

During the Reconstruction period immediately following the Civil War, an Imperial Congress postured to make an end run around the U.S. Constitution. One of the first important measures was promulgation in their proposal for a Fourteenth Amendment. This amendment, secured at bayonet point, created a colorable citizenship known as a "citizen of the United States". To that point, People generally thought of themselves as United States citizens just as they do today; and the body of the U.S. Constitution even makes rhetorical use of the term "Citizen of the United States", but People were Citizens of their respective Union States, and this term could have referred to no other status, since there was no such thing as "federal citizenship" when the U.S. Constitution was written. The distinction between separate classes of citizens is best demonstrated by comparing court decisions, the first in 1855, the second in 1875:

A citizen of any one of the States of the union, is held to be, and called a citizen of the United States, although technically and abstractly there is no such thing. To conceive a citizen of the United States who is not a citizen of some one of the States, is totally foreign to the idea, and inconsistent with the proper construction and common understanding of the expression as used in the Constitution, which

1    must be deduced from its various other provisions.  The object then to be attained,

2    by the exercise of the power of naturalization, was to make citizens of the respective

3    States. (Ex Parte Knowles, 5 Cal. 300 (1855))

4

5    We have in our political system a Government of the United States and a

6    government of each of the several States.  Each one of these governments is

7    distinct from the others, and each has citizens of its own who owe it allegiance, and

8    whose rights, within its jurisdiction, it must protect.  The same person may be at the

9    same time a citizen of the United States and a citizen of a State, but his rights of

10   citizenship under one of these governments will be different from those he has

11   under the other. (United States v. Cruikshank, 95 U.S. 542 (1875))

12

13   Where the state Citizen, identified in the Preamble of the U.S. Constitution and in
     1:2:2, 1:3:3, 2:1:5, 3:2:1, and 4:2:1, is a Sovereign or Principal, the Fourteenth
14   Amendment citizen of the United States belongs to a subject, or subordinate, class, as
     demonstrated by Section 1 of that "amendment":

15   Section 1. All persons born or naturalized in the United States, and subject to the

16   jurisdiction thereof, are citizens of the United States and of the State wherein

17   they reside. No State shall make or enforce any law which shall abridge the

18   privileges or immunities of citizens of the United States; nor shall any State

19   deprive any person of life, liberty, or property, without due process of law; nor

20   deny to any person within its jurisdiction the equal protection of the laws.

21

22   The citizen of the United States (a/k/a "federal citizen") is distinct from the state Citizen,
     or there wouldn't have been any need to restate due process rights already articulated in
23   the Fifth Amendment. In the framework of what has already been covered, it is clear
     that Citizens of the States (a/k/a state Citizens) were not then, and are not now,
     "subject to the jurisdiction" of the United States within the several States. This
24   matter was addressed by Thomas Jefferson by way of "The Kentucky Resolutions" in
     response to the Alien and Sedition Acts in 1798.   The second of nine resolutions
25   addressed the matter of United States authority to punish crimes:

26   2. Resolved, That the Constitution of the United States, having delegated to

27   Congress a power to punish treason, counterfeiting the securities and current coin of

28   the United States, piracies, and felonies committed on the high seas, and offenses

Appendix A - 10

1    against the law of nations, and no other crimes whatsoever.

2    [Emphasis added]

3
4    Where Jefferson articulated the limited, direct authority which the United States
     could exercise over state Citizens, the Fourteenth Amendment citizen of the United
5    States appears to be subject to United States authority wherever s/he might be,
     whether in the geographical United States (a/k/a "the federal zone"), or in any of the
6    several States which are parties to the U.S. Constitution (a/k/a "the state zone"). More
     to the point, however, the subject class of citizens of the United States would be viewed
7    on a par with corporations, associations, and other artificial entities created, franchised,
     and/or sanctioned by government, and United States authority would reach into the
8    States under the auspices not of inherent or unalienable Rights -- Rights which
     American Founders proclaimed to be the direct endowments from God, but under the
9    notion of civil rights -- rights granted by government to its subject classes.

10        From this point forward, the American dialogue concerning Law was to change,
     departing the biblical base of Common Law where God is Sovereign and Man is
11   endowed directly by His Creator, to embrace a secular view of man whereby the
     individual is little more than a chattel property, and exists solely for the
12   convenience and exploitation of entrenched powers (read "Oligarchy"). This
     change is easily demonstrated in the Roe v. Wade decision which threw the door open to
13   abortion on demand. Even though medical science long ago demonstrated that life
     begins at conception, the U.S. Supreme Court did not consider either the existence or
14   sanctity of life in the landmark decision. The unborn baby, conveniently referred
     to as a "fetus," does not qualify as a "person" in the context of the Fourteenth
15   Amendment definition promulgated by Congress, so, since the unborn lacks legal
     standing, the law is indifferent to his existence; whether or not life has intrinsic value or
16   unborn babies have God-given rights wasn't and isn't even considered.

17        The so-called Fourteenth Amendment effected a subtle perversion of first
     causes. Where state Citizens, being Sovereign, have God-given rights which are
18   merely secured by the state and federal constitutions, the subject citizen of the United
     States falls under Congress' Article IV legislative jurisdiction; the list of his
19   constitutionally assured rights is itemized in the Fourteenth Amendment. Beyond that,
     he is dependent on Congress for grants of privilege; rather than God, government is the
20   federal citizen's prime mover.

21        The next important move was incorporation of the District of Columbia as a
     municipal corporation and political subdivision of the geographical, or self-interested,
22   United States (federal government). Original incorporation was in 1871, with several
     Re-organizations during that decade and since. Thereafter, the corporate federal
23   government became increasingly important, particularly through late-century
     westward development, as the United States (federal government) managed settlement
24   territory simultaneously with post-Civil War reconstruction—the days of Carpet Bagger
     plunder. Then, in 1884, the Supreme Court gave way to powerful influences in the
25   Julliard case when it reversed Justice Fields from four years earlier by concluding
     that Congress could print paper money because the U.S. Constitution does not
26   expressly prohibit United States paper money.

27   Considering provisions of Article I, Sec. 8, Clause 5 (1:8:5), and Article I, Section 10,
     Clause 1 (1:10:1), of the U.S. Constitution, which stipulate that Congress will mint
28   coin and regulate value, and the several States cannot make anything but gold and
     silver coin a tender for payment of debt, the Julliard decision was conspicuously

1    contrary to constitutional intent, but as Naval Academy founder George Bancroft
2    pointed out in a detailed rebuttal to the decision (A Plea for the Constitution of the
     United States: Wounded in the House of Its Guardians), Julliard was based on
3    Congress' legislative jurisdiction under Article IV of the U.S. Constitution, in the
     geographical United States. Thus, manifestation of Congress' dual role—exercise only
4    of delegated power under Article I within the several States, and exercise of any
     power not specifically prohibited by the U.S. Constitution within the geographical
5    United States (the federal zone) under Article IV. So far as lawful implication, the
     People and the governments of the several States had the Right to reject United
6    States paper money, as several court decisions confirm; but, as a practical matter,
     the nation was largely changed over to paper money, rather than gold and silver coin, by
7    the time the Federal Reserve Act established the Federal Reserve System in 1913. By
     1933, the Federal Reserve Note, not to be confused with the current Federal Reserve
8    Bank Note, was backed 60% by obligations of the United States, and by 40% gold.

9    Congress also engaged in massive land-grabs both within the Continental United States
     and abroad. Takeover of the Hawaiian Islands, going to war with Spain to take the
10   Philippines, Puerto Rico, etc., and nearly all States admitted to the Union after the Civil
     War were blackmailed into land concessions. Oklahoma, admitted in 1907, adopted
     the following provision at Article I, Section 3 of the state constitution:

11   The people inhabiting the State do agree and declare that they forever disclaim all

12   right and title in or to any unappropriated public lands lying within the boundaries

13   thereof.

14

15   Even though the U.S. Constitution grants authority for the United States (federal
     government) to establish nothing more than forts, magazines, arsenals, dockyards and
16   other needful buildings within the several States, from the time of the Civil War, well
     into this century, including mineral-rich Alaska, Congress indulged its greed for
17   land; whereas the intent of American Founders, via the U.S. Constitution, the
     "Ordinance of 1887: The Northwest Territorial Government", and other such
18   instruments, was clearly to keep the federal beast locked soundly within its box which
     was, for the most part, limited to the ten miles square (100 square miles) authorized for
19   the seat of the federal government. Toward the end of the 19th century, some of the
     retained federal lands within the several States were declared to be national parks.
20   Development of federally owned resources accelerated in the 1930's via public
     works programs, such as building dams for flood control and electrical generation, and
21   a multitude of other enterprises.

22   On the enforcement and judicial fronts, there was a corresponding re-organization.
     The Department of Justice was created by Act of Congress on June 22, 1870
23   (Forty-First Congress, Session II, Chapter 150, pages 162 et seq.), with the Attorney
     General at the head of this organization. To that point, each government agency or
24   department pretty well took care of its own legal affairs, but the Act establishing the
     Justice Department consolidated authority over most enforcement and legal matters,
     including those of the Department of the Interior.

25   Changing United States courts around was a somewhat longer process, but it was
     managed over time. The United States Circuit Courts became United States Courts of
26   Appeal via Act of Congress on March 3, 1891, and organization of United States
     District Courts, with amendments since, was accomplished by Act of Congress on
27   March 3, 1911 (Sixty-First Congress, Session III, Chapter 231, pages 1087 et seq.).

28

## Part II:  Current Federal Jurisdiction in the States

While some of the seemingly unrelated history conveyed in Part I of  this memorandum might appear  not to address United States judicial authority  within the  several States, it will fall into place when  the office  of "federal magistrate"  is addressed.  Magistrates in United States District Courts are simply federal park commissioners and nothing more. The name was changed, but the character and jurisdiction of the office did not.

The territorial jurisdiction of federal magistrates, which is easily demonstrated by way of two statutes, is concurrent with jurisdiction of United States District Courts within the several States.   Or at least it would appear so.

The first definition, in relative  part, comes from Title 18 of the United States Code, the Code  of Criminal  Procedure, at  Section  7,  with particular attention to  7(3) (U.S.C., 1979 edition):

7.  Special maritime and territorial jurisdiction of

The United States defined

The term "special maritime and territorial jurisdiction of the United States", as used in this title [18 U.S.C.  1 et seq.], includes:

(3) Any  lands reserved  or acquired for the use of the United States,  and under  the exclusive  or  concurrent jurisdiction thereof, or any place purchased or otherwise acquired by   the  United   States  by  consent  of the legislature of  the State in which the same shall be, for the erection  of a  fort, magazine, arsenal, dockyard, or other needful building.

The second definition comes from the so-called Buck Act, at 4 U.S.C.

110 (1995 Lawyer's Cooperative CD-ROM edition):

110. Same; definitions

As used in sections 105-109 of this title --...

(d)  The  term "State"  includes any Territory or possession of the United States.

(e) The term "Federal area" means any lands or premises held or acquired by or for the use of the United States or any department, establishment, or agency of the United States; and any Federal area, or any part thereof, which is located within the exterior boundaries of any State, shall be deemed to be a Federal area located within such

State.

[Emphasis added]

Definition of the term "State" as included in the above cite, and as used in both the United States Code and in the codes of the various States, is essential to understanding that most statutes in the United States Code presume application in federal "States" such as the District of Columbia, Puerto Rico, etc., and not within the several States which are parties to the U.S. Constitution. The distinction in 18 U.S.C. 7(3) is subtle, but becomes clearer when read very carefully: special territorial jurisdiction, where the United States Code of Criminal Procedure is applicable, embraces: (1) "Any lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction," (2) "or any place purchased or otherwise acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building."

In the first instance, the United States (federal government) has exclusive or concurrent jurisdiction over any land acquired for any purpose; whereas, in the second instance, the United States (federal government) has jurisdiction only over lands which are acquired for a constitutional purpose, as specified in Article I, after the land has been ceded to the United States by the State Legislature. In the District of Columbia, Puerto Rico, the Virgin Islands and other United States (federal government) possessions classified as "States" in federal municipal law, Congress has unrestricted and exclusive legislative jurisdiction, pursuant to Article IV, so purchase of land for United States (federal government) use automatically comes under Congress' legislative jurisdiction, with or without consent of the State Legislative body. In the second instance, legislatures of the several States must cede jurisdiction over acquired property to the United States (federal government) before any judicial authority can be exercised.

The Buck Act definition of "State" is about as straightforward as any of the various definitions of "State" which refer to the federal "States":

The term "State" includes any Territory or possession of the United States.

A similar definition of the term is located in Rule 54 of the Federal Rules of Criminal Procedure:

"State" includes    District of    Columbia, Puerto    Rico, territory and insular

possession.

Jurisdiction of United States District Courts, being limited to federal "States" and to federal enclaves within the several States, is further reinforced by another Rule 54 application:

"Act of Congress" includes any act of Congress locally applicable to and in force in

the District of Columbia, in Puerto Rico, in a territory or in an insular possession.

The distinction between federal "States" and the several [Union] States is clarified in the jurisdiction and venue statute (territorial jurisdiction) governing conduct of federal courts. According to The United States Government Manual for 1995/96, at page 75, this statute is 18 U.S.C. 3231 (1979 edition, U.S.C.):

3231. District courts

The district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States.

Nothing in this title [18 U.S.C. 1 et seq.] Shall be held to take away or impair the jurisdiction of the courts of the several States under the laws thereof.

Notice, however, that the first paragraph above mentions the "district courts of the United States" ("DCUS") but fails to mention the United States District Courts ("USDC"). Inclusio unius est exclusio alterius. They are not one and the same.

If the distinction between the federal "States" and the several [Union] States is not made clear enough by 3231, proof of the distinction is found in the legislative history for 18 U.S.C. 3241, again using the 1979 edition of the United States Code ("U.S.C."), to wit:

3241. Jurisdiction of offenses under certain sections

The United States District Court for the Canal Zone and the District Court of the Virgin Islands shall have jurisdiction of offenses under the laws of the United States, not locally inapplicable, concurrently within the territorial jurisdiction of such courts, and jurisdiction, concurrently with the district courts of the United States, of offenses against the laws of the United States committed upon the high seas.

At various times, other territorial courts were included in this statute. The district court of the Philippines was removed in 1946 when the island nation became an independent commonwealth; then "Act July 7, 1958 deleted 'District Court for the Territory of Alaska'...." In other words, up until the point at which Alaska was admitted to the Union, that Territory was considered a federal "State." Once admitted to the Union, Alaskan courts no longer qualified as courts of the United States. State courts, because of Tenth and Eleventh Amendments and the Separation of Powers Doctrine, could not legitimately exercise any federal authority. The Canal Zone district court has been removed from this statute since the 1979 U.S.C. edition was published, so the District Court of the Virgin Islands is the only remaining federal "State" court that exercises concurrent jurisdiction with District Courts of the United States ("DCUS") under 18 U.S.C. 3241.

We turn now to the "special territorial" jurisdiction found at 18 U.S.C. 7(3) by way of examining the evolution of what are today known as "federal magistrate judges", formerly known as "federal magistrates", and before that, as "national park commissioners". The first selection comes from historic and amendment notes following 28 U.S.C. 631, which provides for appointment and tenure of federal magistrate judges (1995 Lawyer's Cooperative CD-ROM edition of U.S.C.):

1979. Act Oct. 10, 1979, in subsec. (a), substituted

Appendix A - 15

1   "Where the conference deems it desirable, a magistrate may be designated to serve
    in one or more districts adjoining the district for which he is appointed. Such a
2   designation shall be made by the concurrence of a majority of the judges of
    each of the district courts involved and shall specify the duties to be performed by
3   the magistrate in the adjoining district or districts." for "Where an area under the
    administration of the National Park Service, or the United States Fish and
4   Wildlife Service, or any other Federal agency, extends into two or more judicial
    districts and it is deemed desirable by the conference that the territorial
5   jurisdiction of a magistrate's appointment include the entirety of such area, the
    appointment or reappointment shall be made by the concurrence of a majority of
6   all judges of the district courts of the judicial districts involved, and where there is
    no such concurrence by the concurrence of the chief judges of such
7   district courts."; in subsec.   (b), in the introductory matter,
    inserted "reappointed to", in para. (1), inserted ", and has been for at least 5 years," in
8   cl. (A), inserted "or", in cl. (B) deleted "or" following "Islands;" deleted cl. © which
    read:   "in an area under the administration of the National Park Service, the
9   United States Fish and Wildlife Service, or any other Federal agency that extends
    into two or more States, a member in good standing of the bar of the highest court of
10  one of those States;'" in para. (4), substituted "; and" for a period and added para.
    (5), redesignated subsecs. (f)ü(j) as subsecs. (g)ü(k) respectively; and added new
11  subsec. (f).
    [emphasis added]

13  Before examining deletions made in the 1979 amending Act, it will be useful to import
14  the index from earlier law pertaining to national park commissioners before all the name
    changes, with the current Magistrate Act at 28 U.S.C. 631-639:

15      Amendments (1995 Lawyer's Cooperative CD-ROM edition of

16  **U.S.C.):**

17      1954. Act Aug. 13, 1954, ch 728, 1©, 68 Stat. 704, amended the analysis of this

18      chapter by adding "and expenses" to item 633.

19      1968. Act Oct. 17, 1968, P. L. 90-578, Title I, 101, 82 Stat. 1108, amended the
20      analysis of this chapter by substituting items 632 through 639 for items which read:

21      "632 .Park commissioners; jurisdiction and powers;
22
23      procedure

24      "633 .Fees and expenses
25
        "634 .Salaries of Park Commissioners; disposition of
26
27      fees

28      "635 .Park Commissioners; residence

"636 .Accounts

"637 .Oaths, acknowledgments, affidavits and

depositions

"638 .Seals

"639 .Dockets and forms;  United States Code".

1972.  Act Mar. 1, 1972, P.L. 92-239,  3, 86 Stat. 47, amended the  analysis of  this

chapter by substituting ", powers, and  temporary assignment"  for "and  powers"  in

item 636.

It is also useful to see the evolution of this Act dating to the last century:

> Based on  title 28, U.S.C., 1940 ed., 526 and 527,
> sections 27,  66, 80e,  100, 117e,  129, 172, 198e, 204e,
> 256d, 395e, 403c-5, 403h-5, 404c-5, and 408m of title 16,
> U.S.C., 1940  ed., Conservation, and section 863 of title
> 48, U.S.C., 1940 ed., Territories and Insular Possessions
> (May 27, 1894, ch. 72, 5, 28 Stat. 74; May 28, 1896,
> ch. 252, 19, 20, 29 Stat. 184; Apr. 12, 1900, ch.
> 191, 34, 31 Stat. 84; Mar. 2, 1901, ch. 814, 31 Stat.
> 956; Mar. 3, 1911, ch. 231, 291, 36 Stat. 1167; Jan.
> 7, 1913, ch. 6, 37 Stat. 648; Aug. 22, 1914.

Section consolidates  section 526 and a portion of 527, both of  title 28, U.S.C., 1940

ed., with provisions of sections 27,  66, 80e,  100, 117e,  129, 172, 198e, 204e, 256d,

395e,  403c-5, 403h-5, 404c-5 and 408m of title 16, U.S.C., 1940  ed., and provisions

of section 863 of title 48,  U.S.C.,  1940  ed.,  Territories  and  Insular

Possessions, relating  to appointment  of United  States commissioners. For  other

provisions of said sections see Distribution Table.

Some of the provisions  of section  863 of title  48, U.S.C., 1940 ed., Territories

and Insular Possessions were retained in that title.

The provision  of sections  395e, 403c-5,  404c-5,  and 408m of  title 16, U.S.C.,

1940 ed., for appointment of the  Park  Commissioner  in  the  Hawaii  National

Park, Shenandoah National  Park, Great Smoky Mountains National Park, Mammoth

Cave National Park and Isle Royale National Park upon "the recommendation of the Secretary of the Interior" was omitted as inconsistent not only with other provisions of this title but with other statutes applicable to other national parks.

All such park commissioners are United States commissioners and the revision of these sections makes possible uniformity and consistency in administrative matters concerning such commissioners. (See, also, sections 604 and 634 of this title.)

Words "the Director of the Administrative Office of the United States Courts" were substituted for "Attorney General" in section 526 of title 28, U.S.C., 1940 ed., in view of the general supervision by the Director over clerks and commissioners under section 601 et seq. of this title.

A provision in section 526 of title 28, U.S.C., 1940 ed., that commissioners should have the same powers and duties as are conferred and imposed by law, was omitted as superfluous.

[emphasis added]

Jurisdiction provisions relating to federal magistrate judges/national park commissioners were enacted in definitive terms for the Grand Canyon National Park Commissioner:

Special commissioner for Grand Canyon National Park; appointment; jurisdiction; compensation. Act Sept. 14, 1959, P. L. 86-258, 1-3, 73 Stat. 546, provided:

"Sec .1. The United States District Court for the District of Arizona shall appoint a special commissioner for the Grand Canyon National Park, Arizona. The commissioner shall hold office for four years, unless sooner removed by the district court, and he shall be subject to the general laws and requirements applicable to United States commissioners.

"Sec .2. The jurisdiction of the commissioner in adjudicating cases brought before him shall be limited to the trial, and sentencing upon conviction, of persons charged with the commission of those misdemeanors classified as petty offenses

1   (18 U.S.C. 1) [18 U.S.C. 1] relating to the violation of Federal laws or regulations

2   applicable within the park: Provided, That any person charged with a petty offense

3   may elect to be tried in the district court of the United States; and the

4   commissioner shall apprise the defendant of his right to make such election, but shall

5   not proceed to try the case unless the defendant, after being so apprised, signs a

6   written consent to be tried before the commissioner. The exercise of additional

7   functions by the commissioner shall be consistent with and be carried out in

8   accordance with the authority, laws, and regulations of general application to

9   United States commissioners. The rules of procedure set forth in title 18, section

10  3402, of the United States Code [18 U.S.C. 3402], shall be followed in the handling

11  of cases by such commissioner. The probation laws shall be applicable to

12  persons tried by the commissioner and he shall have power to grant probation.

13  [emphasis added]

14
15  Now we go to a few court cases to nail the matter down:

16  Powers and duties were coextensive with limits of judicial district in which he

17  was appointed. United States v. Harden, 10 F 802 (D.C. N.C., 1881); United

18  States v. Stern, 177 F 479 (D.C. Pa. 1910).

19  Purpose of Federal Magistrates Act, 28 U.S.C. 631 et seq., was to provide method

20  to relieve judges of some of their non-Article III functions. United States v. First

21  National Bank of Rush, 576 F.2d 852 (10th Cir., 1978), 78-1 USTC 9462, 42 AFTR

22  2d 78-5049.

23  Purpose of Federal Magistrates Act (28 U.S.C. 631-638) is to remove from

24  workload of United States District Courts matters which are more desirably

25  performed by lower tier of judicial officers. United States v. Richardson, 57

26  FRD 196 (D.C. N.Y., 1972).

27

28  Evolution of the federal magistrate judge demonstrates that he is merely a glorified
    national park commissioner, who is a bar-licensed attorney, and his territorial jurisdiction

1  is concurrent with jurisdiction of the United States District Court ("USDC") where he
serves. As previously demonstrated via analysis of 18 U.S.C. 7(3) and 4 U.S.C.
2  110(d) & (e), there is a gray area where there might be some discretion. In the federal
"States", United States District Court venue and jurisdiction may extend to national parks
3  and other lands retained by the United States, but in the several States which are parties
to the U.S. Constitution, United States territorial authority may be exercised only on
4  federal enclaves, i.e. lands ceded to the United States by legislatures of the several
States, "for the erection of a fort, magazine, arsenal, dockyard, or other needful
5  building" (1979 edition, U.S.C.). There is, and was, no constitutional authority for
Congress to retain land for the United States, as was the case in Oklahoma, Colorado,
6  Nevada, Alaska, etc., in States admitted to the Union subsequent to the Civil War.
Nevada appears to be leading the charge on this issue, namely, the right of the United
7  States (federal government) to retain land in the several States other than for
constitutional purposes; and it is clear, by distinctly separate authorities pertaining to
8  federal "States" and to the several States in 18 U.S.C. 7(3) & 3231 and 4 U.S.C.
1001(d) & (e), that application of judicial authority in the United States Code of
9  Criminal Procedure limits jurisdiction to federal enclaves which have been ceded by
legislatures of the several States for constitutional purposes only.

10

11  Still, this is a vague area which has yet to be thoroughly explored:

12  Within the several States, the United States has judicial authority either: (1) on

13  federal enclaves ceded by legislatures of the several States for constitutional

14  purposes, or (2) on federal enclaves ceded for constitutional purposes and in national

15  parks. In his memorandum, Becraft frames his conclusion concerning United

16  States judicial jurisdiction by basing it on an 1885 Supreme Court decision, even

17  though the decision was premised on facts relative to the federal reservation at

18  Ft. Leavenworth, Kansas:

19

20  The single most important case regarding the subject of federal jurisdiction appears

21  to be Fort Leavenworth R. Co. v. Lowe, 114 U.S. 525, 531, 5 S.Ct. 995 (1885),

22  which sets forth the law on this point fully. There, the railroad company property

23  which passed through the Fort Leavenworth federal enclave was being subjected

24  to taxation by Kansas, and the company claimed an exemption from state taxation.

25  In holding that the railroad company's property could be taxed, the Court

26  carefully explained federal jurisdiction within the States:

27  The consent of the states to the purchase of lands within them for the special

28  purposes named, is, however, essential, under the constitution, to the transfer to the

1  general government, with the title,  of  political  jurisdiction  and dominion.

2  Where lands are acquired without such consent, the  possession of  the  United

3  States, unless political jurisdiction is ceded to them in some other  way, is  simply

4  that  of an  ordinary proprietor.  The property in that  case, unless used as  a means

5  to carry out the purposes of the government,  is   subject  to   the   legislative

6  authority and  control of the states equally with the property of private individuals.

7

8  Thus, the cases decided within the 19th century clearly disclosed the  extent and scope

9  of both State and federal jurisdiction.   In  essence, these  cases, among  many

10  others,  hold  that the  jurisdiction  of  any  particular State is  co-extensive with its

11  borders or territory, and all persons  and property  located or  found therein  are

12  subject to such jurisdiction;  this jurisdiction is superior.  Federal jurisdiction

13  results only from a conveyance of state jurisdiction  to  the  federal government

14  for  lands owned or otherwise possessed by the federal government,  and  thus

15  federal  jurisdiction  is extremely limited  in nature.   And  there is  no federal

16  jurisdiction  if  there be  no  grant or cession of jurisdiction by  the State  to  the

17  federal  government.   Therefore, federal   territorial jurisdiction   exists only  in

18  Washington, D.C., the  federal  enclaves  within  the States, and the territories and

19  possessions of the United States.

20  [emphasis added]

21

22
23  During  the  Eisenhower administration,  the matter  of federal jurisdiction within  the
   States  was addressed  at length by  a specially formed Interdepartmental Committee
24  for the  Study  of Jurisdiction Over  Federal Areas  Within the  States, with both State
   and  United  States  (federal  government)  representatives participating in the study.
25  Assistant Attorney General Mansfield D. Sprague  chaired the  committee. Part I of the
   report,  titled "The  Facts  and  Committee  Recommendations,"  was  submitted  to
26  Attorney General Herbert  Brownell,  Jr.,  then  transmitted  to President Eisenhower in
   April,  1956, and Part II, titled "A Text of the  Law  of  Legislative Jurisdiction," was
27  submitted in June, 1957.   The latter report, in particular, affirms the conclusion that
   United  States judicial  authority within  the  several States extends only so far as the
28  constitutional grant:

   The Constitution  gives express  recognition to but one means of  Federal acquisition

1  of legislative jurisdiction ... by State consent under Article I, section 8, clause 17.

2  ... Justice McLean suggested that the Constitution provided the sole mode for

3  transfer of jurisdiction, and that if this mode is not pursued, no transfer of

4  jurisdiction can take place. [Page 41]

5  It scarcely needs to be said that unless there has been a transfer of jurisdiction (1)

6  pursuant to clause 17 by a Federal acquisition of land with State consent, or (2) by

7  cession from the State to the Federal Government, or unless the Federal

8  Government has reserved jurisdiction upon the admission of the State, the Federal

9  Government possesses no legislative jurisdiction over any area within a State,

10  such jurisdiction being for exercise by the State, subject to non-interference by the

11  State with Federal functions. [Id., at 45]

12  The Federal Government cannot, by unilateral action on its part, acquire legislative

13  jurisdiction over any area within the exterior boundaries of a State. [Id., at 46]

14

15  On the other hand, while the Federal Government has power under various

16  provisions of the Constitution to define, and prohibit as criminal, certain acts

17  or omissions occurring anywhere in the United States, it has no power to punish for

18  various other crimes, jurisdiction over which is retained by the States under our

19  Federal-State system of government, unless such crime occurs on areas as to which

20  legislative jurisdiction has been vested in the Federal Government. [Id., at 107]

21

22  The 1957 report appears to accommodate United States (federal government) retention
and/or acquisition of land, and therefore legislative and judicial jurisdiction, other
23  than that specifically prescribed in the U.S. Constitution under Article I authority.
Therefore, if the report is correct on this hair-splitting matter, congressional blackmail
24  of States admitted to the Union after the Civil War would appear to be legitimized, and
the report seems to accommodate legislative cession of land to the United States
25  (federal government) for other than constitutional purposes ... national parks, flood
control, and electrical generation dams, etc.

26  However, the jury is still out on this matter, because recent U.S. Supreme Court
decisions such as New York v. United States et al., 505 U.S. ___, 120 L.Ed.2d 120, 112
27  S.Ct. 2408 (1992), seem to condemn this conclusion under authority of the Tenth
Amendment and the Separation of Powers Doctrine. The United States (federal
28  government) cannot exercise any authority within the several States which is not

1  specifically enumerated in Article I of the U.S. Constitution; and officers of the
several States cannot accommodate any United States (federal government) exercise
2  of power which is not specifically delegated under Article I, without first securing a
constitutional amendment.

3  Regardless of the Tenth Amendment and the Separation of Powers issues, any given Act
of Congress, under United States judicial authority, applies only to the extent of the Act
4  and attending regulations, with territorial limits prescribed at 18 U.S.C. 7(3) and 4
U.S.C. 110(d) & (e).

5  Generally speaking, territorial bounds for United States judicial authority are
applicable with respect to both civil and criminal matters, with diversity of citizenship
6  being the only
exception in civil matters. This expansion of United States judicial authority does not
7  extend to criminal matters, except as specified by Thomas Jefferson in "The Kentucky
Resolutions." The U.S. Supreme Court has repeatedly prescribed the limits of
8  federal criminal jurisdiction in definitive terms. The conclusive statement is this:
"[Federal] legislation applies only within the territorial jurisdiction of the United
9  States unless a contrary intent appears [in the legislation] ...." See the numerous
authorities for this statement, e.g. Caha v. United States, 152 U.S. 211, 215 (1894), 14
10  S.Ct. 513; American Banana Company v. United Fruit Company, 213 U.S. 347
(1909), 357, 29 S.Ct. 511; United States v. Bowman, 260 U.S. 94 (1922), 97, 93, 43
11  S.Ct. 39; Blackmer v. United States, 284 U.S. 421 (1932), 437, 52 S.Ct. 252; Foley
Bros. v. Filardo, 336 U.S. 281 (1949), 285, 69 S.Ct. 575; United States v. Spelar, 338
12  U.S. 217, 222 (1949), 70 S.Ct. 10; and United States v. First National City Bank, 321
F.2d 14, 23 (2nd Cir. 1963).
13

14  The matter is addressed in Rule 54 of the Federal Rules of Criminal Procedure
[selected portions, 1978 edition, U.S.C.]:
15

16  **Rule 54. Application and Exception**

17  (a) Courts. These rules apply to all criminal proceedings in the United States
18  District Courts ....

19  © Application of terms. As used in these rules the following terms have the
20  designated meanings.
21

22  "Act of Congress" includes any act of Congress locally applicable to and in force in
23  the District of Columbia, in Puerto Rico, in a territory or in an insular
24  possession.

25  The words "demurrer," "motion to quash," "plea in abatement," "plea in bar"
26  and "special plea in bar," or words to the same effect, in any act of Congress shall be
27  construed to mean the motion raising a defense or objection provided in Rule 12.

28  "Federal Magistrate" means a United States magistrate as defined in 28 U.S.C.

631-639, a judge of the United States or another judge or judicial officer specifically empowered by statute in force in any territory or possession, the Commonwealth of Puerto Rico, or the District of Columbia, to perform a function to which a particular rule relates.

"Judge of the United States" includes a judge of a district court, court of appeals, or the Supreme Court.

"Law" includes statutes and judicial decisions.

"Magistrate" includes a United States magistrate as defined in 28 U.S.C. 631-639, a judge of the United States, another judge or judicial officer specifically empowered by statute in force in any territory or possession, the Commonwealth of Puerto Rico, or the District of Columbia, to perform a function to which a particular rule relates, and a state or local judicial officer, authorized by 18 U.S.C. 3041 to perform the functions prescribed in Rule 3, 4, and 5.

"State" includes District of Columbia, Puerto Rico, territory and insular possession.

"United States magistrate" means the officer authorized by 28 U.S.C. 631-639.

Application of Acts of Congress was clearly articulated in Caha v. United States supra, where the Supreme Court stated as follows:

The laws of Congress in respect to those matters do not extend into the territorial limits of the states, but have force only in the District of Columbia, and other places that are within the exclusive jurisdiction of the national government.

Application of terms in Rule 54 of the Federal Rules of Criminal Procedure appears to exclude jurisdiction of United States courts on national parks within the several States, as has repeatedly been demonstrated via 4 U.S.C. 110(d) & (e) and 18 U.S.C. 7(3) definitions and applications, and the definition of "State" cited above; but, regardless of this hair splitting, United States judicial authority via United States District Courts, which is concurrent with the jurisdiction of national park commissioners (now known as federal magistrate judges), does not extend to the several

1  States in any general way, other than in territory ceded by the legislatures of the
2  several States, whether for constitutional purposes or for national parks. Thus, the law
   of legislative jurisdiction is preserved in the convoluted United States Code by
   tracking the history and evolution of various federal courts and their officers.
3

4  **Part III:  Character of Law & Court Effect on Jurisdiction**

5  Judicial authority of the United States is established in Article III of the U.S.
   Constitution:

6  **Article III**

7  Section 1.  The judicial Power of the United States, shall be vested in one

8  supreme Court, and in such inferior Courts as the Congress may from time to

9  time ordain and establish. The Judges, both of the supreme and inferior Courts, shall

10 hold their Offices during good Behavior, and shall, at stated Times, receive for

11 their Services a Compensation, which shall not be diminished during their

12 Continuance in Office.

13 Section 2. [1] The judicial Power shall extend to all
   Cases, in Law and Equity, arising under this Constitution, the Laws of the United
14 States, and Treaties made, or which shall be made, under their Authority; --
   to all Cases affecting Ambassadors, other public Ministers and Consuls; -- to all
15 Cases of admiralty and maritime Jurisdiction; -- to Controversies to which the United
   States shall be a Party; -- to Controversies between two or more States; -- between
16 a State and Citizens of another State; -- between Citizens of different States; --
   between Citizens of the same State claiming Lands under the Grants of different States,
17 and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.
        [2] In all Cases affecting Ambassadors, other public Ministers and
18
19 Counsels, and those in which a State shall be a Party, the Supreme Court shall

20 have original Jurisdiction. In all the other Cases before mentioned, the supreme

21 Court shall have appellate Jurisdiction, both as to Law and Fact, with such

22 Exceptions, and under such Regulations as the Congress shall make.

23 [3] The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury;

24 and such Trial shall be held in the State where the said Crimes shall have been

25 committed; but when not committed within any State, the Trial shall be at such

26 Place or Places as the Congress may by Law have directed.

27 Section 3. [1] Treason against the United States, shall consist only in levying War

28 against them, or, in adhering to their Enemies, giving Aid and Comfort. No person

Appendix A - 25

1   shall be convicted of Treason unless on the Testimony of two Witnesses to the

2   same overt Act, or on Confession in open Court.

3   [2] The Congress shall have Power to declare the Punishment of Treason, but no

4   Attainder of Treason shall work Corruption of Blood, or Forfeiture except during the

5   Life of the Person attainted. [copied from Black's Law Dictionary, 6th edition]

6

7

8   The U.S. Supreme Court has classified the judicial authority which is granted under
    Article III into three categories: First, those cases in Common Law and equity which are
    cognizable within the framework of the Section 2, Clause 1 "arising under" clause;
9   second, admiralty and maritime jurisdiction under Section 2, Clause 1; and third,
    cases pertaining to ambassadors, etc. Cases relating to the several States are affected
10  by the Eleventh Amendment, ratified in 1798, but don't materially affect the instant
    matter.

11        Concern in this context focuses on two types of law and the
    originating source. Use of the term "law" in Article III of the
12  U.S. Constitution, as is the case for due process amendments in
    the Bill of Rights (first Ten Amendments, particularly the
13  Fourth, Fifth, Sixth and Seventh), contemplates the Common Law of
    English-American lineage. Equity, also known as chancery,
14  pertains primarily to commercial or contract law, and is
    voluntary on the part of participating parties. In other words, Common Law was
15  assumed and construed to be the Law of the Land applicable both within the United
    States (the federal zone) and within the several States (the state zone).
16
    Constitutional intent was carried out by the first Congress via the Judicial act of 1789.
17  In this Act, original cognizance over admiralty and maritime affairs was vested in courts
    of the United States, exclusive of the several States, with a safeguard built in, known as
18  the "saving to suitors clause." Suitors, or parties to an action, could remove to
    Common Law jurisdiction where the Common Law was competent to provide a
19  remedy. The saving to suitors clause is retained in the current United States Code. See
    28 U.S.C. 1333(1).
20
    In the beginning, admiralty and maritime jurisdiction applied only to matters concerning
21  international contracts and affairs on the high seas, with the law of nations providing a
    guiding light.
22  The Supreme Court, early on, concluded that, while admiralty jurisdiction is
    conveyed in Article III, 2, Clause 1, it is distinct from authority pertaining to law
23  and equity and,
    therefore, does not fall under authority of the "arising under" clause   See American
24  Insurance Co. v. 356 Bales of Cotton, 26 U.S. 511 (1828), 7 L.Ed 242; Romero v.
    International Terminal Operating Co., 358 U.S. 354 (1959), 3 L.Ed.2d 368, 79 S.Ct. 468,
25  reh. den. 359 U.S. 962, 3 L.Ed.2d 769, 79 S.Ct. 795.

26

27  The nature and origin of admiralty law is set out in Vol. 1 of Corpus Juris, 1914 edition,
    p. 1249, as follows:

28

Appendix A - 26

## I.    DEFINITION

[ 1]    Admiralty is that branch or department of jurisprudence which relates to and regulates maritime property, affairs, and transactions, whether civil or criminal.  In a more limited sense it is the tribunal exercising jurisdiction over maritime causes  and administering the Maritime law by a procedure peculiar to itself and distinct from that followed by courts either of equity or of common law.

## II.    ORIGIN AND GROWTH

[ 2]    A. Under the Civil Law.    Admiralty courts owe their origin and procedure largely to the civil law, which prevailed in Italy and along the north coast of the Mediterranean, where naval commerce was originally most active, and where, after the fall of the Western Empire, the merchants and traders by sea brought about the establishment of a court of consuls in each of the principal maritime cities to hear causes arising out of maritime commerce and property.  The judges of these consular courts were chosen on Christmas of each year by the chief merchants, and they enforced and applied to controversies the customs of the sea, whose origin is long anterior to the civil law itself.    These courts gradually developed and extended their jurisdiction as maritime commerce became more profitable and important, until ultimately, in most states, they were merged into, and became known as, courts of admiralty.

[ 3] B. In England.  The admiralty is a court of ancient origin, traceable back in English jurisprudence to the reign of Edward I, and exercising a jurisdiction coeval and coextensive with that of other foreign maritime courts;  indeed, by some authorities it is said to have existed long before that time. But owing to the hostility which, from historic causes, gradually developed in England against the civil law, the jurisdiction of admiralty was there greatly restricted and limited, both by statute and by decisions of the common-law courts interpreting the same. A reaction in favor of the admiralty courts has now taken place, however, and by acts of parliament they have regained much of their lost jurisdiction, and have acquired jurisdiction over all claims for damages done by any ship, whether on land or water.

[ 4] C. In the United States. It is now well settled, after much controversy, that the jurisdiction of the courts of admiralty in the United States is not limited to that of

1    the English admiralty at the time of the Revolution, but is derived from the early

2    usages of the statutes and the federal laws and decisions.

3

4    The history related above hardly does justice to the continued English-American battle
     over imposition of admiralty law which, as the article suggests, is in the nature of
5    Roman Civil Law, British feudal law, or simply Civil Law, whereby legislative and
     administrative bodies are ultimate authorities without any reference to an
6    independent judicial body. This kind of rule had
     the effect of setting English Barons against King John I, with the results being the
7    Magna Charta, signed in 1215, and in 1640, the Popular Rebellion which ended Star
     Chambers and convoluted ecclesiastical courts under Charles I. American founders
8    were fully aware of the effects of admiralty or Civil Law—the vice-admiralty courts of
     George III were largely responsible for the Revolution. Thus, the "saving to
9    suitors" clause was incorporated in the Judicial Act of 1789.

10   However, in the period following the Civil War, Congress found admiralty rule
     convenient and, as the geographical United States, under Congress' alleged Article IV
11   legislative jurisdiction, became an increasingly powerful influence, admiralty rule was
     extended. First, as already noted from The United States Government Manual of
12   1995/96, circuit courts were changed to courts of appeal by Act of March 3, 1891,
     then United States District Courts were reorganized and set by Act of March 3, 1911
13   (Sixty-First Congress, Sess. III, Chap. 231, pp. 1087, et seq. [Public No. 475]). The
     nature of United States District Courts is revealed in the Act at 9: "The district courts,
     as courts of admiralty and as courts of equity ...."

14   In other words, the United States District Courts, from the Act of March 3, 1911 on, if
15   not before, have never really had a Common Law character in federal territories, and
     their legitimate relationship to and within the several States has at best been at arm's
16   length and shaky, where the real party of interest is the geographical United States
     (federal government) under Congress' Article IV legislative jurisdiction, exclusive of
17   Article I delegated authority. However, within federal areas or territories, as
     described in the Buck Act at 4 U.S.C. 4(e), and the first part of 18 U.S.C. 7(3), the
18   same limitation does not apply, as disclosed at 11 of Corpus Juris supra, p. 1251:

19        [11] 7. Territorial courts. Although admiralty jurisdiction can be exercised
          in the states in those courts only which are established in pursuance of the
20        third article of the constitution, the same limitation does not extend to the
          territories, and congress may vest admiralty jurisdiction in courts created by a
21        territorial legislature as well as in territorial courts created by act of congress,
          and it has exercised this power in both instances. [In re Cooper, 143 U.S. 472, 12
22        Sec. 453, 36 L.Ed 232; The City of Panama, 101 U.S. 453, 25 L.Ed. 1061;
          American Insurance Co. v. 356 Bales of Cotton supra ....]

23

24   To say that United States District Courts didn't have a Common Law character isn't
     precisely correct. In diversity suits at law or in equity, or suits covered by other
25   provisions of the "arising under" clause, they appear to have had a "law"
     character. However, in 1938, via Erie Railroad Co. v. Tompkins, the U.S. Supreme
26   Court declared that there is no longer a national or general Common Law. Today,
     they operate exclusively under "Special maritime and territorial jurisdiction of the
27   United States," as defined at 18 U.S.C. 7(3), under admiralty/civil law rules,
     which are contrary to the Common Law indigenous to the several States. In fact,
28   court decisions disclose that they have only admiralty and vice-admiralty capacities
     and, in effect, they either accommodate private international law or they serve as
     administrative law courts (see 5 U.S.C. 701 et seq.). The U.S. Supreme Court, the

District Court of the United States ("DCUS"), and the U.S. Court of International Trade, are the only remaining United States courts which have a true Article III judicial character and, under Rule 17.1 of the Supreme Court Rules, the Supreme Court has original jurisdiction over actions at law.

The fine line determining applicability of the Article III, 2, Clause 1 "arising under" clause is the real party of interest. So long as an agent or agency of the United States (federal government) is carrying out an Article I delegated power within the several States, courts of the United States have jurisdiction by way of the "arising under" clause, whether as the complaining party or defendant. However, if an agent or agency of the United States operates under Congress' article IV legislative jurisdiction, which is exclusive to the geographical United States (read "the federal zone"), or to the United States (federal government), which is a foreign corporation with respect to the several States, the "arising under" clause does not apply because the act is perpetrated under color of law. This is so because the "Act of Congress", which is locally applicable only in the District of Columbia, Puerto Rico, etc., does not legitimately reach the several States, or the population of state Citizens inhabiting those several States.

For example, in Dan Meador's Public Notice Memorandum pertaining to the character of the "Internal Revenue Service" ("IRS") and proper application of the Internal Revenue Code ("IRC") (which, to date, has been published as legal notice in Oklahoma, Nebraska and Montana newspapers), He demonstrated that the IRS is an agency of the Department of the Treasury, Puerto Rico (Congress never created a Bureau of Internal Revenue, predecessor of IRS), and that no taxing statute in the IRC is applicable to the several States, save as pertains to import duties on alcohol, tobacco, and firearms in Subtitle E, and certain items in Subtitle D of the IRC (i.e. Windfall Profits Tax on off-shore and imported petroleum). In the event that officers and agents who allege to represent United States (federal government) laws and interests prove to be operating under color of law within the several States, then United States judicial authority cannot spare them from accountability in the framework of laws and courts of the several States.

Suppose a soldier stationed at Ft. Sill robbed a store or murdered someone in Lawton, Oklahoma. The fact that he is in United States military service and might have even used an Army-issued gun does not affect the law he broke, or the sovereign territorial authority which originates there, and is responsible for enforcing the law. In other words, immunity travels only so far as legislative jurisdiction, and the precise limit of any given law. Under Congress' Article I delegated authority, agents and officers of the United States have certain legitimate duties which reach the several States, but under Congress' Article IV authority in the geographical, self-interested United States (federal zone), the cloak of immunity is shed at borders of the several States, except on federal enclaves which have been ceded by legislatures of the States to the United States (federal government) for constitutional purposes only.

This distinction between United States "arising under" and admiralty jurisdiction is territorial in nature, particularly when admiralty jurisdiction is exercised under authority of Article IV in the geographical United States and when it represents United States (federal government) interests outside of Congress' role as the Article I legislative body for national government. Even then, this authority must comply with the law of legislative jurisdiction. If this is not the case, then the limitations of the Tenth Amendment and of the Separation of Powers Doctrine have no effect.

1
2

## Part IV:  Statute Application Determined by Regulation

3
4
5
6
7

The Administrative Procedures Act, located at 5 U.S.C. 552 et seq., and the Federal Register Act, located at 44 U.S.C. 1501 et seq., provide the means for determining what statutes in any given Act of Congress are applicable where.  If a statute has general application, then the agency head responsible for carrying out whatever duties the statute prescribes is required to promulgate regulations disclosing the who, what, when, where and how, and have the regulation published in the Federal Register, if it has general application.  If regulations are not published in the Federal Register, they have at best limited application.  The controlling statute in the Federal Register Act is 44 U.S.C. 1505(a):

8

1505. Documents to be published in Federal Register.

9
10

(a) Proclamations and Executive Orders;   documents having general applicability and legal effect;  documents required to be published by Congress.

11

There shall be published in the Federal Register—

12
13
14

(1) Presidential  proclamations and Executive orders, except those  not having general applicability and legal effect  or effective only against Federal agencies or persons in their capacity as officers, agents, or employees thereof;

15
16
17

(2) documents or classes of documents that the President may determine from time to time have general applicability and legal effect;  and

18
19

(3) documents or classes of documents that may be required so to be published by Act of Congress.

20
21
22

For the purposes of this chapter [44 U.S.C. 1501 et seq.] every document or order which prescribes a penalty has general applicability and legal effect.

23
24
25
26

At 44 U.S.C. 1507, the provision is made that, "The contents of the Federal Register shall be judicially noticed ...", and at 1510, which establishes the Code of Federal Regulations, it provides at subsection (e) that, "The codified documents [in the Code of Federal Regulations] of the several agencies published in the supplemental edition of the Federal Register ... shall be prima facie evidence of the text of the documents and of the fact that they are in effect on and after the date of publication."

27
28

In other words, where the several States and the general population are concerned, a statute created by Act of Congress is somewhat like a hot air balloon that will not get off the ground until someone pumps hot air into it (as if it does not have enough hot air already). Regulations are to statutes as hot air is to the balloon. As stated in 1505(a)(1),

if regulations for any given statute aren't published in the Federal Register, application is limited to Federal agencies or persons acting in their capacity as officers, agents, or employees of Federal agencies.

Provisions of 44 U.S.C. 1505(a) is restated at 1 CFR 5.2:

5.2 Documents required be filing for public inspection and publishing.

The following documents are required to be filed for public inspection with the Office of the Federal Register and published in the Federal Register:

(a) Presidential proclamations and Executive orders in the numbered series, and each other document that the President submits for publication or orders to be published.

(b) Each document or class of documents required to be published by act of Congress.

© Each document having general applicability and legal effect.

Citations of authority requirements are as follows:

**21.40 General requirements: Authority citations.**

Each section in a document subject to codification must include, or be covered by, a complete citation of the authority under which the section is issued, including—

(a) General or specific authority delegated by statute;

and

(b) Executive delegations, if any, necessary to link the statutory authority to the issuing agency.

**21.41 Agency responsibility.**

(a) Each issuing agency is responsible for the accuracy and integrity of the citations of authority in the documents it issues.
(b) Each issuing agency shall formally amend the citations of authority in its codified material to reflect any changes thereto.

The character of Federal statutory law, and the need for regulations, have been addressed time and again by the U.S. Supreme Court and Circuit Courts of Appeal. Many of the clearer statements relate to application of the IRC, as in California

1  Bankers Association   v. Schultz, 416 U.S. 21 (1974), 26, 94 S.Ct.   1494, 1500, 39
2  L.Ed.2d 812:

> Because it has a bearing on our treatment of some of the issues raised by the
> parties, we think it important to note that the Act's civil and criminal penalties
> attach only upon violation of regulations promulgated by the Secretary;  if the
> Secretary were to do nothing, the Act itself would impose no penalties on anyone.

In Foley Brothers v. Filardo, 336 U.S. 281 (1949), the high court said, "It is a well
established principle of law that all federal legislation   applies only   within   the
territorial jurisdiction of the United States unless a contrary intent appears."   In
order for a contrary intent to be facilitated, delegations of authority and implementing
regulations must be published in the Federal Register, and/or any given statute must
clearly articulate application.

Fortunately, there is a reasonably easy way to discern what statutes in the United
States Code have general application to the several States and to the population at
large.  This is through the Parallel Table of Authorities and Rules, which begins on page
751 of the 1995 Index Volume to the Code of Federal Regulations. Its authority is
located at 1 CFR  8.5(a):

> (a) Parallel tables of statutory authorities and rules.
> In the Code of Federal Regulations Index or at some other place as the Director of
>
> the Federal Register considers appropriate, numerical lists of all sections of the
>
> current edition of the United States Code (except section 301 of title 5) which are
>
> cited by issuing agencies as rule-making authority for currently effective regulations
>
> in the Code of Federal Regulations.  The lists shall be arranged in the order of the
>
> titles and sections of the United  States   Code  with  parallel  citations  to  the
>
> pertinent titles and parts of the Code of Federal Regulations

This handy finding aid lists United States Code statutes by title and section in the
left-hand column, if implementing regulations have been published in the Federal
Register, and applicable regulations by title and part, in the right-hand column.   If
the statute doesn't appear, it doesn't have implementing regulations which have been
published in the Federal Register, signifying that, in accordance with 44 U.S.C.
1505(a)(1) provisions, the statute is applicable only to Federal agencies, or the officers,
agents, and employees of Federal agencies.  If the statute number does appear and a
regulation is cited, the regulation must be consulted to determine application.

Where the instant matter is concerned, the table immediately
resolves the matter of territorial jurisdiction for United States
District Courts:  there are no implementing regulations for 18
U.S.C.  7 & 3231. The absence of implementing regulations for
these two statutes confirms that the special maritime and
territorial authority of the United States District Court
("USDC") does not reach into the several States and to the
population at large;  the authority applies only on federal
enclaves which have been ceded to the United States for
constitutional purposes and, as the second paragraph of 3231 specifies, the laws and
judicial authority of the several States are superior and govern within areas of the States

1   which are not within federal enclaves that have been ceded to Congress by the legislatures of the several States.

2 Further, there are no implementing regulations for 28 U.S.C. 631-639, the Federal

3 Magistrate Act. That is to say, these glorified national park rangers in black robes, known as federal magistrate judges, have no authority in the several States.

4 Therefore, the United States District Courts have no authority within the several States, per the following:

5     **Powers** and **duties** were **coextensive with limits of judicial district** in which he

6     was appointed. United States v. Harden, 10 F 802 (D.C. N.C., 1881); United

7     States v. Stern, 177 F 479 (D.C. Pa., 1910).

8     [emphasis added]

9

10 Where matters pertaining to alleged offenses under the IRC are concerned, there are no implementing regulations to support IRC 7402, which prescribes jurisdiction for "district courts of the United States" [sic] and for "United States district courts" [sic].

11 This confirms the proofs published in Meador's Public Notice Memorandum which demonstrates that there are no implementing regulations for IRC statutes

12 prescribing taxing, assessment, and collection authority, save as relates to import duties on distilled spirits, etc., itemized in Subtitle E of the IRC, with the general authority

13 being 27 CFR, Part 70, which is under the exclusive administration of the Bureau of Alcohol, Tobacco and Firearms ("BATF"). This also confirms the existence of the

14 USDC and the DCUS, operating side-by-side in the United States Code.

15     Matters relating to United States securities, etc., are

16 commonly at issue in federal prosecutions, so it is useful to

17 briefly examine underlying the authorities. The U.S. Constitution, at Article I, 8, Clause 1, provides, "The Congress shall have Power [1:8:5] to coin Money [and] regulate the Value thereof,"

18 and at 10, Clause 1, stipulates that, "No State shall ... coin Money; emit Bills of Credit; make any Thing but gold and silver Coin a Tender in Payment of Debts ...."

19 Since these provisions have never been amended or repealed, underlying authorities

20 for current United States credit and monetary systems should be examined for application:

21     12 U.S.C. 226. "Federal Reserve Act"    NO REGULATION
    12 U.S.C. 227. "Banking Act of 1933"    NO REGULATION

22     12 U.S.C. 228. "Banking Act of 1935"    NO REGULATION

23

24 There are no regulations applicable to the several States for the Jury Selection and Service Act, 28 U.S.C. 1861 et seq.

25 Use of the Parallel Table of Authorities and Rules is probably easiest to demonstrate by analysis of an actual case issued via the Department of Justice and a United States

26 Attorney. In order to do this, we will use United States of America v. Kenney F. Moore, Colleen Moore, and Wayne Gunwall, 96 CR-082C, United States District

27 Court for the Northern District of Oklahoma, Tulsa, under stamped impressions of Neal Kirkpatrick, Assistant U.S. Attorney, and Fred White, grand jury foreperson.

28 The same people were charged in 95 CR-129C in the fall of 1995 by the same Assistant U.S. Attorneys, with Mr. White serving as grand jury foreperson. The case was assigned

to the same judge. However, the grand jury foreperson was presented with some of the same information included in this memorandum, and subsequently the Moores and Mr. Gunwall filed criminal complaints against federal government principals, sending complaints and evidence to the United States District Court in care of the court Clerk, and to the Oklahoma Attorney General, W. A. Drew Edmondson. The complaint was received by the Clerk of the United States District Court on Friday, Nov. 17, then Assistant U.S. Attorney Kirkpatrick entered a motion to dismiss charges on Monday, Nov. 20.

Grand jury indictment against the Moores and Mr. Gunwall were allegedly issued again on May 15, 1996, with a "SUMMONS IN A CRIMINAL CASE" (96-CR-082-C) issued July 5, 1996, under the semblance of a signature for Phil Lombardi, allegedly the issuing officer of some undisclosed rank and horsepower.

This case is interesting for a number of reasons, and would not be included in this memorandum except that federal government insiders have chosen to scandalize the Moores and Mr. Gunwall via statewide Oklahoma media. One of the crucial points is that, after receiving summons for Dr. and Mrs. Moore (the Government sent the Gunwall summons to the Moores and Moore papers to Gunwall), Mr. Gunwall drove from Ponca City to Tulsa and attempted to secure copies of relevant material from the office of the Clerk of the United States District Court. But, the file was unavailable, allegedly still at an old office that wasn't open that particular day. Yet, the information was made available to Oklahoma print and broadcast media, and principals from the United States federal government and the office of Oklahoma Attorney General Edmondson fueled media reporting with comments.

It would be difficult to inflict much more injury on the Moores and Mr. Gunwall than federal government officials have already choreographed. The question of the moment, however, concerns charges issued against Dr. & Mrs. Moore and Mr. Gunwall:

What authority lies behind them?

Government charges rest on four statutes, presented here in the order in which

they appear on the face of the alleged grand jury indictment: 18 U.S.C. 371:

Conspiracy; 26 U.S.C. 7212(a): Interfering with Administration of Internal

Revenue Laws; 18 U.S.C. 1341: Mail Fraud; and 18 U.S.C. 2: Aiding and

Abetting.

By consulting the Parallel Table of Authorities and Rules supra, it is found that there are no implementing regulations extending general application authority to the several States and the population at large for any of these statutes. Therefore, the statutes are applicable only to agencies of the United States and to officers, agents, and employees thereof, per 44 U.S.C. 1505(a), cited above.

The only charge which might be of some concern would be mail fraud, because Congress is obligated under Article I, 8 of the U.S. Constitution with providing mail services for the several States. However, manipulation of the Postal Service was one of the first congressional initiatives which, for all practical purposes, has moved the whole of United States federal government under Congress' Article IV legislative jurisdiction within the federal zone (the geographical "United States"). This was done via Act of Congress by the Thirty-Seventh Congress, Session III, Chapter 71 (1863). Sections 22 & 23 of this Act distinguish between "domestic" mail within the federal zone and "drop" mail elsewhere.

1    Today, the United States Postal Service ("USPS"), a domestic corporation of
     the United States (federal government), handles "domestic" mail in the federal
2    zone (the District of Columbia,
     Puerto Rico, etc.), and "non-domestic" mail delivered in the
3    several States and elsewhere. Regulatory application of 18
     U.S.C. 341 demonstrates the paradox for the United States
4    federal government: even though Congress is charged under
     Article I of the U.S. Constitution with responsibility for maintaining mail service
5    within the several States, alleged Article IV authority to govern the federal zone in
     any fashion not specifically prohibited by the U.S. Constitution confers absolutely no
6    authority in, and with respect to, the several States which are parties to the U.S.
     Constitution. Therefore, where Congress has elected to incorporate the USPS under
7    Article IV authority, statutes prescribing penalties for mail fraud, etc., are not
     applicable to, or enforceable in, the several States.

8

9    **Part V: Summary and Conclusion**

10
       Through the 1930's, evolution of the corporate United States
11

12   federal government, under Congress' alleged Article IV
     legislative jurisdiction in the federal zone (i.e. the
13   geographical, self-interested United States), was referred to as "corporatism".
     Presently, the U.S. Supreme Court and various other courts use the term "cooperative
14   federalism" to refer to the de facto arrangement between the United States federal
     government and the governments of the several States (the latter operating under the
15   presumption that they are federal "States", rather than independent republics subject
     only to Congress' Article I delegated authority). This diabolical scheme, from
16   control of production and distribution of goods and services, to the mathematically
     impossible social welfare system and criminal enforcement, is premised on the notion
17   that all activity is commercial in nature. The effect has been to treat the entire nation
     as a seamless garment which is under Congress' Article IV exclusive legislative
18   jurisdiction, rather than as a patchwork of fifty independent republics which are subject
     only to Congress' Article I delegated constitutional authority.

19   Thankfully, in the last few years, the U.S. Supreme Court has provided a footing which
     affords the possibility of correction. In New York v. United States supra, the high
20   Court reiterated principles framed by the Tenth Amendment and the Separation of
     Powers Doctrine: so far as the several States are concerned, Congress can exercise
21   only those powers specifically delegated by the U.S. Constitution, and officers of the
     several States cannot accommodate a United States (federal government) power which
22   is not delegated without first securing a Constitutional amendment. Unrestricted
     application of the commerce clause has been taken to task in Lopez and other such cases
23   which are cited in Lopez.

24   Unfortunately, judicially correcting the problem isn't as easy as it should be. Through
     the years, the U.S. Supreme Court has occasionally conveyed a message by way of
25   decisions, or more appropriately, non-decisions. When the high Court has been
     presented with evidences such as the failed ratifications of the Fourteenth and
26   Sixteenth Amendments, the maxim has been articulated: ratification of amendments
     is a "political," rather than a "judicial," question.

27   If we read history properly, the nation's high Court attempted to hold the line prior to
     acquiescence in Julliard (1884), and again resisted socialistic New Deal legislation until
28   yielding in Erie Railroad (1938). The choice in both cases appears to have been

1  pragmatic, yielding constitutional principles to the political tide, further enhancing
2  the probability and prospects of a hidden oligarchy in America.

3  In light of the current pervasive circumstance, it is necessary to revisit first causes in
   order to address the situation.  As set forth in Part I of this Memorandum, American Founders
4  proclaimed that the "laws of Nature and Nature's God" govern nations and Men, and that all
   Men are endowed with certain unalienable Rights by their Creator.   This foundation is
5  acknowledged in the preambles to state and federal constitutions: the sovereign  American
   People, by way of their Constitutions, have granted only certain, specifically enumerated
6  powers to their state and federal governments.

7  In New York v. United States supra, the U.S. Supreme Court addressed the matter of
   authority. In the American system, the question isn't what power governments should have,
8  but what powers have actually been delegated.  The high Court further concluded that public
   servants, who usurp powers which are not delegated, invariably do so for self-serving ends.
9  The problem, of course, is accountability.

10  As the development history presented in the Becraft memorandum demonstrates, the several
    States preceded the "United States".  The original thirteen colonies secured independence from
11  English rule, and  each thereby established sovereignty as an independent nation.     The
    confederation which they maintained following the Revolution was, at best, weak, having
12  precious little authority over the several new States.  This arrangement threatened the harmony,
    and even the survival, of that Confederation.   These difficulties spawned the Constitutional
13  Convention in 1787, with the first States convening under the U.S. Constitution and with the
    U.S. Constitution vesting the United States (federal government) with only the authority
14  necessary to carry out its expressly delegated responsibilities.  However, the People and the
    several States did not surrender any more power than was delegated;   they retained that
15  which they did not delegate, including sovereignty over the territories within the respective
    States of the Union.

16  Thomas Jefferson, responding to the Alien and Sedition Acts, addressed this very problem, and
    the proper order of things in the American system of government, in the Kentucky Resolutions:

17

18  8th. Resolved, That a committee of conference and correspondence be appointed,

19  who shall have in charge to communicate the preceding resolutions to the

20  Legislatures of the several States;  to assure them that this commonwealth

21  continues in the same esteem of their friendship and union which it has

22  manifested from the moment at which a common danger first suggested a common

23  union;  that it considers union, for specified national purposes, and particularly to

24  those specified in their late federal compact, to be friendly to the peace,

25  happiness and prosperity of all the States:   that faithful to that compact,

26  according to the plain intent and meaning in which it was understood and acceded to

27  by the several parties, it is sincerely anxious for its preservation: that it does also

28  believe, that to take from the States all the powers of self-government and transfer

1    them to a general and consolidated government, without regard to the special

2    delegations and reservations solemnly agreed to in that compact, is not for the

3    peace, happiness and prosperity of these States; and that therefore this

4    commonwealth is determined, as it doubts not its co-States are, to submit to

5    undelegated, and consequently unlimited powers in no man, or body of men on

6    earth: that in cases of an abuse of the delegated powers, the members of the general

7    government, being chosen by the people, a change by the people would be the

8    constitutional remedy; but, where powers are assumed which have not been

9    delegated, a nullification of the act is the rightful remedy: that every State has a

10   natural right in cases not within the compact—to nullify of their own authority all

11   assumptions of power by others within their limits: that without this right, they

12   would be under the domination, absolute and unlimited, of whosoever might

13   exercise this right of judgment for them: that nevertheless, this commonwealth, from

14   motives of regard and respect for its co-States, has wished to communicate with

15   them on the subject: that with them alone it is proper to communicate, they

16   alone being parties to the compact, and solely authorized to judge in the last resort

17   of the powers exercised under it, Congress being not a party, but merely the

18   creature of the compact, and subject as to its assumptions of power to the final

19   judgment of those by whom, and for whose use itself and its powers were all

20   created and modified:

21   That if the acts before specified should stand, these conclusions would flow from

22   them; that the general government may place any act they think proper on the

23   list of crimes, and punish it themselves whether enumerated or not enumerated

24   by the constitution as cognizable by them: that they may transfer its

25   cognizance to the President, or any other person, who may himself be the accuser,

26   counsel, judge and jury, whose suspicions may be the evidence, his order the

27   sentence, his officer the executioner, and his breast the sole record of the

28   transaction: that a very numerous and valuable description of the inhabitants of

1  these States being, by this precedent, reduced, as outlaws, to the absolute dominion

2  of one man, and the barrier of the Constitution thus swept away from us all, no

3  rampart now remains against the passions and the powers of a majority in Congress

4  to protect from a like exportation, or other more grievous punishment, the minority

5  of the same body, the legislatures, judges, governors and counselors of the States,

6  nor their other peaceable inhabitants, who may venture to reclaim the

7  constitutional rights and liberties of the States and the people, or who for other

8  causes, good or bad, may be obnoxious to the views, or marked by the suspicions

9  of the President, or be thought dangerous to his or their election, or other interests,

10  public or personal ....

11

12  Jefferson's argument is as valid now as it was in 1798:

13  Congress and the other branches of federal government are not parties to the U.S.
   Constitution; they are products of it. The U.S. Constitution vests Congress with certain
14  delegated authorities under Article I, and nothing more. Within its own borders, State
   authority is antecedent to that of the United States and, as parties to the U.S. Constitution,
15  the several States have both the right and responsibility to correct their agent, the United States
   (federal government), when ambition seeks to abuse or expand the powers which have been
16  delegated. Of more immediate importance where the instant matter is concerned, those
   who exceed the law, whether in the State governments or in the United States (federal
17  government), are accountable to the Law of the Land, and ultimately, to the People of the Land,
   within the several States. Operation under color of law is outlaw and criminal, and
18  accountability must be in Law. Judges, magistrates, attorneys for the Department of Justice, and
   other enforcement people, do not have immunity when they exceed the law as it is written.

19  This memorandum conclusively demonstrates jurisdiction of United States District Courts
   within the several States. Implicitly, authority of the Department of Justice, and of the United
20  States (federal government) enforcement agencies attached to that Department, is concurrent
   with that of United States District Courts, because the lawful authority of any given agency
21  extends only so far as the legislative jurisdiction of the government it serves. All legislation
   is territorial in nature.

22

23

24

25

26

27

28